# United States Court of Appeals
## For the First Circuit

No. 11-2472

SHANE O. MOFFAT,

Plaintiff, Appellant,

v.

UNITED STATES DEPARTMENT OF JUSTICE,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Denise Jefferson Casper, U.S. District Judge]

Before

Lynch, Chief Judge,
Boudin and Lipez, Circuit Judges.[*]

David A.F. Lewis for appellant.
Jennifer A. Serafyn, Assistant United States Attorney, with
whom Carmen M. Ortiz, United States Attorney, was on brief.

June 14, 2013

---

[*] Judge Boudin participated in the semble in this matter, but
did not participate in the issuance of the panel's opinion. The
remaining two panelists therefore issued the opinion pursuant to 28
U.S.C. § 46(d).

**LIPEZ, Circuit Judge**.  Appellant Shane O. Moffat commenced this action under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, seeking information from the Federal Bureau of Investigation ("FBI") that he believes will exonerate him from his conviction for first degree murder.  The government produced certain heavily redacted documents in response to the complaint, and asserted various exemptions to disclosure of the documents' full contents.  The district court subsequently granted the government's motion for summary judgment, finding that Moffat had received all of the relief to which he was entitled.  The court also awarded Moffat attorneys' fees, after significantly reducing both the number of hours that were compensable and the requested hourly rate of Moffat's counsel.

Moffat appeals the district court's grant of summary judgment, contending that the government's invocation of the FOIA exemptions is evidence that it did not respond to his request in good faith.  He requests vacatur and remand of the district court's order so that, among other things, he can take discovery concerning his claims.  He also appeals the fee award, challenging the district court's calculation of his hourly rate.  We affirm.

**I.**

**A.  Factual Background**

In 2001, Moffat was tried for murder in the Commonwealth of Massachusetts.  During his criminal proceedings, the Hampden

-2-

County District Attorney's office gave him a document that purports to be an FBI 302 report dated December 9, 1999. Although the record is silent as to how this document came into the district attorney's possession, Moffat alleges that it came from the U.S. Attorney's Office for the District of Connecticut.[1] This mostly-redacted document includes notes from an interview conducted by federal law enforcement officials with an individual named Desmond Wolfe, as a result of a proffer agreement between Wolfe and the government. Although the document given to Moffat contains substantial redactions, portions of the report reveal the names of the agents and government prosecutors who were present at the interview.[2] During the interview, Wolfe recounted a conversation he had with a man named "Screw" regarding "a murder that occurred in Springfield." Screw told Wolfe that on the day of the murder, he and another individual named "Shane," presumably referring to Moffat, "licked a man down and now he died." The murder victim owed Shane money and Screw witnessed Shane commit the murder.

Moffat was convicted of murder in October 2001 and sentenced to life imprisonment. His conviction was based in part on the theory that he was alone at the crime scene when the murder

---

[1] The document contains faint and partially obscured lines at the top margins of its pages, which list a fax number and the words "US Attys Off." The document also discusses an interview that took place at the U.S. Attorney's Office in Hartford, CT.

[2] The record does not disclose what entity or individual made the redactions in Moffat's version of the report.

took place. He alleges that the individual named "Screw" mentioned in the FBI 302 report is an alias for a man named Everol Bartlet, who actually committed the crime. Since the FBI 302 report places Bartlet at the murder scene, Moffat asserts that it undermines the prosecution's theory of the case.

On November 12, 2008, Moffat submitted FOIA requests to the FBI at its main office in Washington, DC, believing that the agency possessed information that may exonerate him. These requests sought, inter alia, a copy of the FBI 302 report discussed above, all records that mention or refer to Moffat, and any documents that refer to Moffat in connection with the investigation and prosecution of Desmond Wolfe. He later filed similar requests with four FBI field offices after his request to the main office was unproductive.

The FBI conducted initial searches but did not uncover any responsive information; the main office and four field offices denied Moffat's requests. Moffat filed administrative appeals of those decisions, to no avail.

## B. Procedural History

Moffat initiated this action in December 2009, appending his copy of the FBI 302 report to his complaint as well as the history of his communication with the FBI. As a result of the litigation, the FBI conducted searches for files directly pertaining to the subjects of Moffat's requests, as well as

-4-

searches for any documents that included mere mentions of or passing references to the subjects in question. The government labels the former type of searches "main file searches," and the latter "cross-reference searches." These searches located 20 pages of responsive documents. The FBI states that its initial responses to Moffat's requests had not produced these documents because, due to resource constraints, it solely conducts main file searches in response to administrative requests. Only when a complaint is filed does the government initiate a cross-reference check. This cross-reference check evidently uncovered the documents in question.

On March 29, 2010, the FBI provided Moffat with 16 of the 20 pages, most of which were heavily redacted, and withheld the remaining four pages as duplicates. Among the responsive documents were portions of the December 9, 1999, FBI 302 report. The FBI's version of the report contains more redactions than Moffat's version, and blacks out the names of the FBI agents who conducted the investigation, Wolfe's name, as well as most of the factual details discussed above. The FBI invoked Exemptions 6, 7(C), and 7(D) to justify these redactions, relying on privacy concerns and the need to protect confidential sources.

After producing these documents, the government moved for summary judgment, asserting that it had conducted an adequate search of its records and had produced all information responsive

to Moffat's various FOIA requests. The government also contended that it was justified in asserting the claimed exemptions. Moffat responded by challenging the adequacy of the government's search methods. Additionally, he noted that he already had a less-redacted version of the FBI 302 report in his possession, and that the agency could not continue to withhold information that had already been revealed. He contended that the government's ongoing assertion of the exemptions "reflects their bad faith in the entire process."

In a lengthy and thoughtful memorandum opinion and order, the district court granted the government's motion, agreeing that the FBI's search was adequate and that it had properly claimed the exemptions asserted.[3] The district court noted, however, that the FOIA litigation had resulted in the production of certain documents and that Moffat had therefore been successful in obtaining some relief. As a result, the district court suggested that he may be entitled to attorneys' fees under 5 U.S.C. § 552(a)(4) as a party that had "substantially prevailed" against the government. The court directed the parties to brief Moffat's entitlement to fees.

Moffat filed the requested brief, contending that he was entitled to fees under FOIA, and seeking $14,500 in fees at an

---

[3] The district court also granted summary judgment in favor of a number of other federal agencies who were defendants in Moffat's suit. Moffat has not appealed the court's order as to those parties.

hourly rate of $225. Although the district court agreed that Moffat was entitled to fees, it reduced the award to $1,600. There were two components to this reduction. The court first lowered the hours compensable by a substantial margin. With respect to the hourly rate of Moffat's counsel, the court noted that he was appointed by the Massachusetts Committee for Public Counsel Services ("CPCS") to represent Moffat in his criminal proceedings, of which the FOIA litigation was a part. Observing that the CPCS reimbursement rate was $100 per hour, the court calculated his fee award using that rate.

Moffat timely appealed the district court's entry of summary judgment, as well as the fee award.

**II.**

**A. Moffat's FOIA Claims**

Our review of the district court's grant of summary judgment is de novo. See Soto-Padró v. Pub. Bldgs. Auth., 675 F.3d 1, 5 (1st Cir. 2012). We view the facts in the light most favorable to the nonmoving party, and may uphold the district court's order only if there is no genuine dispute of material fact and the movant is entitled to judgment as a matter of law. See Candelario del Moral v. UBS Fin. Servs. Inc. of P.R., 699 F.3d 93, 99 (1st Cir. 2012).

Moffat asks that we vacate the district court's entry of summary judgment and permit him to take any necessary discovery,

which would presumably uncover more information responsive to his FOIA requests.  To that end, he raises two separate, but related, arguments.  The first challenges the government's invocations of certain privacy- and confidentiality-related exemptions to justify its redaction of the FBI 302 report.  Moffat also contends that the government responded to his FOIA requests in bad faith, thereby suggesting that it continues to withhold information to which he is entitled.  We address each argument in turn.

**1.  The Exemptions**

FOIA serves to expose the operations of federal agencies "to the light of public scrutiny."  <u>Dep't of the Air Force </u>v. <u>Rose</u>, 425 U.S. 352, 361 (1976) (citation omitted) (quotation marks omitted).  The statute embodies a broad policy in favor of disclosure, reflecting the notion that "promot[ing] an informed citizenry . . . is vital to democracy."  <u>Carpenter</u> v. <u>U.S. Dep't of Justice</u>, 470 F.3d 434, 437 (1st Cir. 2006).  Nevertheless, there are nine categories of exemptions, which permit the government to withhold documents that are otherwise responsive to the request.  <u>See</u> 5 U.S.C. § 552(b); <u>Maynard</u>, 986 F.2d at 554.  The nine exemptions are to be construed narrowly, with all doubts resolved in favor of disclosure.  <u>Carpenter</u>, 470 F.3d at 438.

We exercise de novo review over the district court's determination that withheld materials are exempt from disclosure.  <u>See</u> <u>id.</u> at 437.  The agency bears the burden of demonstrating the

-8-

applicability of the claimed exemption.  See State of Maine v. U.S. Dep't of Interior, 298 F.3d 60, 65 (1st Cir. 2002).

As noted, the only document at issue in this appeal is the FBI 302 report.  The government claimed three exemptions as to this report, namely Exemptions 6, 7(C), and 7(D).  See 5 U.S.C. § 552(b)(6), (7)(C), (7)(D).  The district court discussed only Exemptions 7(C) and 7(D), and we follow suit.[4]

### a.  Exemption 7(C)

Exemption 7(C) permits the government to withhold information "compiled for law enforcement purposes" when the release of that information "could reasonably be expected to constitute an unwarranted invasion of personal privacy."  Id. § 552(b)(7)(C).  The exemption guards the privacy interests of a broad range of individuals, including government agents, personnel, confidential sources, and investigatory targets.  Maynard, 986 F.2d at 566.  The exemption also "protects a broad notion of personal privacy, including an individual's interest in avoiding disclosure of personal matters."  Carpenter, 470 F.3d at 438.  "This notion of privacy 'encompass[es] the individual's control of information

---

[4] Exemption 6 applies to all "personnel and medical files . . . the disclosure of which would constitute a clearly unwarranted invasion of personal privacy."  5 U.S.C. § 552(b)(6).  As Exemption 7(C) protects similar interests and shields a broader range of information, we need not address Exemption 6 separately because "all information that would fall within the scope of Exemption 6 would also be immune from disclosure under Exemption 7(C)."  Roth v. U.S. Dep't of Justice, 642 F.3d 1161, 1173 (D.C. Cir. 2011).

concerning his or her person,' and 'when, how, and to what extent information about them is communicated to others.'" Id. (quoting U.S. Dep't of Justice v. Reporters Comm. for Freedom of the Press, 489 U.S. 749, 789, 762 (1989)).

The exemption requires a court to balance these privacy interests against the public interest in disclosure. Maynard, 986 F.2d at 566 (citing Reporters Comm., 489 U.S. at 762). This public interest must be guided by FOIA's basic purpose, which is "to open agency action to the light of public scrutiny." Reporters Comm., 489 U.S. at 772. This purpose is not "fostered by disclosure of information about private citizens that is accumulated in various government files but that reveals little or nothing about an agency's own conduct." Id. at 773.

In invoking 7(C) as to the FBI 302 report, the agency sought to protect the privacy interests of a number of individuals, including third party informants, FBI personnel, and people merely mentioned in the course of the interview. The gravamen of Moffat's argument is that the privacy interests the government seeks to protect have been substantially reduced or even eradicated by his possession of a less-redacted version of the FBI 302 report. As a result, the diminished privacy interest is now strongly outweighed by the public interest in disclosure.

This line of reasoning fails for two reasons. First, we have previously stated that prior revelations of exempt information

-10-

do not destroy an individual's privacy interest. See Carpenter, 470 F.3d at 440 ("That information has been released to the public domain, especially where the release is limited, has little bearing on the privacy interest. Indeed, in modern society there is little information that has not been released to another." (citations omitted)); see also Rugiero v. U.S. Dep't of Justice, 257 F.3d 534, 545 (6th Cir. 2001) (stating that "no diminution of privacy interests occurs despite the fact that the identifying information is already publicly available"); Weisberg v. U.S. Dep't of Justice, 745 F.2d 1476, 1491 (D.C. Cir. 1984) (holding that prior disclosure of information to Congressional committee did not "undermine[] the privacy interests of these individuals in avoiding harassment and annoyance that could result should the FBI confirm . . . the presence of their names in the [relevant] documents"). The privacy interests the government seeks to uphold remain as strong now as they were before.[5]

On the other side of the balance, Moffat has not identified a public interest powerful enough to outweigh the substantial privacy interests at stake. The public interest FOIA seeks to uphold is the right of citizens to understand and obtain

---

[5] As a subsidiary argument, Moffat suggests that the government is required to make a showing of actual harassment or other harm in order to invoke Exemption 7(C). We have previously rejected this contention. See New Eng. Apple Council v. Donovan, 725 F.2d 139, 142 (1st Cir. 1984) ("[T]he protection of exemption 7(C) is not limited to cases involving 'private facts' or an actual showing of harassment or other harm to government officials.").

information about the workings of their own government.  <u>Maynard</u>, 986 F.2d at 566.  In <u>Carpenter</u>, we explained that "the innocence or guilt of a particular defendant tells the Court 'nothing about matters of substantive law enforcement policy that are properly the subject of public concern.'"  470 F.3d at 441 (quoting <u>Neely</u> v. <u>FBI</u>, 208 F.3d 461, 464 (4th Cir. 2000)).  But this is not to say that information requested by a criminal defendant may never implicate the public interest.  For example, "[t]o the extent . . . that any of the requested material would reveal how the government responded to informants and others who offer information," or "shed light on possible government misconduct," FOIA's purposes may be served.  <u>Id.</u>

Here, Moffat's only discernible interest in the requested information is to challenge his murder conviction, and he has failed to connect his deeply personal stake in this information to a larger governmental function.  While his reply brief states in conclusory fashion that the requested information will "reveal a method of federal law enforcement that is not readily apparent," this assertion is nothing more than speculation.  He articulates no reason why the names and identifying information of specific individuals would shed any light on the conduct of the government. To the extent that he implies the existence of some form of government misconduct, the Supreme Court has said that "where . . . the public interest being asserted is to show that responsible

officials acted negligently or otherwise improperly in the performance of their duties, the requester must establish more than a bare suspicion in order to obtain disclosure." Nat'l Archives & Records Admin. v. Favish, 541 U.S. 157, 174 (2004). Rather, the plaintiff must make a "meaningful evidentiary showing" that the public interest would be served by disclosure. Id. at 175. Moffat's unsupported assertion does not suffice.[6]

Consequently, Moffat has failed to demonstrate that the privacy interests the FBI seeks to protect have waned in strength as a result of the release of a less-redacted version of the FBI 302 report, or that there is a significant public interest in the requested information. Because this balance clearly favors the government, we conclude that Exemption 7(C) was properly invoked.

### b. Exemption 7(D)

Exemption 7(D) permits the withholding of information collected for law enforcement purposes when such information "could reasonably be expected to disclose the identity of a confidential source." 5 U.S.C. § 552(b)(7)(D). The statute also protects any

---

[6] Moffat repeatedly cites a single district court case, Stonehill v. I.R.S., 534 F. Supp. 2d 1 (D.D.C. 2008), for the proposition that our 7(C) analysis must consider the government's prior disclosure. Stonehill, however, addressed a vastly different set of facts, involving the government's withholding of the name of an IRS agent under Exemptions 6 and 7(C) after that name had already been revealed in prior litigation the plaintiff had initiated against the government. Id. at 5. Additionally, the Stonehill court took pains to cabin its holding to the case's unique facts. Id. at 12.

"information furnished by a confidential source" if that information was collected "in the course of a criminal investigation." Id. Unlike under 7(C), if the government demonstrates that the information requested was given under an assurance of confidentiality, 7(D) does not require a further showing that privacy interests outweigh any public interest in disclosure. New Eng. Apple Council, 725 F.2d at 145. Thus, "Exemption 7(D) provides greater protection to a narrower class of persons than does 7(C)." Id.[7]

Moffat contends once again that any interest in protecting confidential sources or information "evaporated" when the Hampden County District Attorney's office provided him with a less-redacted version of the FBI 302 report and that the government was required to justify its continuing withholding in light of the prior revelation. This waiver contention founders on our opinion in Irons v. F.B.I., 880 F.2d 1446 (1st Cir. 1989) (en banc). In that case, plaintiffs initiated a FOIA suit demanding files concerning certain FBI informants who testified at the "trials of alleged Communist leaders in the 1950s." Id. at 1446. The

_____

[7] An assurance of confidentiality can be either express or implied. New Eng. Apple Council, 725 F.2d at 145. Here, the district court found that the information in the FBI 302 report was given under an implied assurance of confidentiality, which can be inferred from "generic circumstances" such as "the nature of the crime investigated and [the informant's] relation to it." Dep't of Justice v. Landano, 508 U.S. 165, 179, 181 (1993). Moffat does not challenge this determination on appeal.

-14-

government invoked Exemption 7(D) in response, and plaintiffs argued that the confidential sources had waived the FBI's right to invoke Exemption 7(D) by testifying in open court concerning the protected information. Id. at 1446-47.

After an exhaustive examination of the statutory text, FOIA's legislative history, and assorted policy considerations, we declined to read a waiver provision into Exemption 7(D)'s straightforward language. The statute authorizes the withholding of any "information furnished by a confidential source" in the context of an ongoing criminal investigation. Id. at 1449 (quoting 5 U.S.C. § 552(b)(7)(D)). "Neither this language, nor any other relevant language," we concluded, "says anything about waiver." Id. As a consequence, we held that "plaintiffs are not entitled to information furnished to the FBI by confidential sources, beyond what has been actually disclosed in the source's prior public testimony." Id. at 1457. This holding makes clear that Exemption 7(D)'s shield does not necessarily disappear when some fraction of the information requested has come to light. The government therefore retained the right to invoke Exemption 7(D) as to the FBI 302 report, notwithstanding the entry into the public domain of some portions of the report.

Irons reserved the question of whether 7(D) continues to apply to the specific information that has already been publicly disclosed. See id. at 1448 ("[W]e are not considering the FBI's

-15-

refusal to make available information restating what the sources <u>in fact</u> revealed at the . . . trials."). Although Moffat's case superficially implicates similar facts, given that some of the information the government seeks to shield has already entered the public domain, we need not address whether 7(D) admits of a limited exception regarding publicly-disclosed information. Even if this possible exception to 7(D) applied, the most Moffat could obtain would be a copy of the FBI 302 report that contains the exact same redactions as the version he already possesses. <u>Irons</u> makes crystal clear that this is the <u>most</u> he is even potentially entitled to, and that the government may properly withhold any information not already revealed. <u>See</u> <u>id.</u> at 1456-57. But that is not the nature of Moffat's claim. His goal is to obtain information <u>other</u> than what he already has, and nowhere does he suggest that his claims would be satisfied if the FBI simply produced a copy of the FBI 302 report that contains the same withholdings as the one in his possession. Indeed, such an endeavor would serve no discernible purpose in this case. Because Moffat does not argue that the government should have provided him with a carbon copy of his version of the FBI 302 report, we do not address his entitlement to such a document.[8]

---

[8] Even assuming that this limited public disclosure exception to 7(D) remains viable, we doubt that it applies to Moffat's circumstances given that the record is silent as to whether his less-redacted version of the FBI 302 report was released with the government's imprimatur. <u>Cf.</u> <u>Irons</u>, 880 F.2d at 1454 (explaining

For these reasons, the government validly asserted Exemption 7(D) as to all the information redacted from the FBI 302 report.

## 2. Bad Faith

Moffat repeatedly asserts that the government's redaction of the FBI 302 report is indicative of its "bad faith" handling of his FOIA requests and its withholding of other responsive documents. Although not always clear in their articulation, Moffat's accusations of bad faith are a challenge to the adequacy of the agency's search in response to his requests. Under FOIA, adequacy is determined not by "whether relevant documents might exist, but whether the agency's search was 'reasonably calculated to discover the requested documents.'" Maynard v. C.I.A., 986 F.2d 547, 559 (1st Cir. 1993) (quoting Safecard Servs., Inc. v. S.E.C., 926 F.2d 1197, 1201 (D.C. Cir. 1991)). "The adequacy of an agency's search for documents under the FOIA is judged by a standard of reasonableness and depends upon the facts of each case." Id. Adequacy "is generally determined not by the fruits of the search, but by the appropriateness of the methods used to carry out the search." Iturralde v. Comptroller of Currency, 315 F.3d 311, 315 (D.C. Cir. 2003).

---

that "there is no reason to apply the 'waiver' doctrine where not only is there no indication that the sources actually wanted to make public the information they did not in fact made public, but also the agency itself does not want such disclosure").

The government bears the initial burden of showing that it conducted an adequate search.  As part of meeting this burden, it may provide an affidavit describing the search it conducted in response to the plaintiff's request.  Id. at 314-15.  "[I]f an agency demonstrates that it has conducted a reasonably thorough search, the FOIA requester can rebut the agency's affidavit only by showing that the agency's search was not made in good faith."  Maynard, 986 F.2d at 560 (emphasis added); see also Oglesby v. U.S. Dep't of the Army, 920 F.2d 57, 68 (D.C. Cir. 1990) (stating that agency has duty to make "a good faith effort to conduct a search for the requested records").[9]  If the plaintiff demonstrates that the agency acted with a lack of good faith in conducting the search, summary judgment must be denied.[10]  See Maynard, 986 F.2d at 560.

---

[9] Although the government asserts that Moffat had waived any challenge to the adequacy of the FBI's search, his repeated references to the government's bad faith are only fairly understood as arguments about adequacy.

[10] A successful challenge to the adequacy of the search could result in a remand requiring the district court to reconsider the adequacy issue, see Perry v. Block, 684 F.2d 121, 128-29 (D.C. Cir. 1982), or for the agency to offer "fuller enlightenment on [its] procedures," Founding Church of Scientology of Wash., D. C., Inc. v. Nat'l Sec. Agency, 610 F.2d 824, 838 n.108 (D.C. Cir. 1979), or for discovery regarding the agency's processes, see Weisberg v. U.S. Dep't of Justice, 627 F.2d 365, 371 (D.C. Cir. 1980). Finally, a case may involve disputes that must be resolved via factfinding.  But see Margaret B. Kwoka, The Freedom of Information Act Trial, 61 Am. U. L. Rev. 217, 249-56 (2011) (discussing rarity of trials in FOIA cases).

Here, Moffat argues that his primary evidence of the FBI's bad faith is the government's continuing assertion of exemptions relating to the FBI 302 report, despite the previous revelation of some of its contents. He purports to use the FBI's treatment of the report as evidence of its bad faith handling of his FOIA requests generally, and as an indication that the agency continues to hide documents from him.

As an initial matter, we question whether an agency's incorrect invocation of FOIA exemptions can ever serve as evidence of bad faith. We are certain, however, that even if the agency claimed an exemption in error, that fact alone does not establish that the government's response lacked good faith, or that the search was inadequate. The adequacy of a search focuses on the reasonableness of the agency's response, not whether that response was legally correct in every particular. See Church of Scientology Int'l v. U.S. Dep't of Justice, 30 F.3d 224, 230 (1st Cir. 1994).

Regardless of whether the exemptions inquiry and the adequacy inquiry can ever overlap, we have already explained that in this case, Exemptions 7(C) and 7(D) were appropriately applied to the FBI 302 report. Consequently, there is no basis to conclude that the government's redactions were unjustified or improper here. Put another way, "[appellant's] prime example of bad faith on the part of the government . . . amounts to nothing more than proper application of the law." Ruqiero, 257 F.3d at 545.

-19-

In his reply brief, Moffat belatedly discusses a wholly separate category of evidence in support of his bad faith argument. Specifically, Moffat takes issue with the FBI's treatment of his FOIA request at the administrative level and its refusal to conduct a cross-reference search until after his complaint was filed. Although Moffat discussed this category of evidence during the summary judgment proceedings in the district court, his failure to do so in his opening brief on appeal waives any argument based upon the agency's initial handling of his FOIA requests. See, e.g., N. Am. Specialty Ins. Co. v. Lapalme, 258 F.3d 35, 45 (1st Cir. 2001) ("There are few principles more securely settled in this court than the principle which holds that, absent exceptional circumstances, an appellant cannot raise an argument for the first time in a reply brief.").

Even if this contention was not waived, it has no basis in the record. In response to Moffat's vague allegations of unfair treatment, the government has come forward with uncontroverted evidence that Moffat's FOIA requests were handled pursuant to general FBI procedure. There is no evidence or even suggestion that the government inappropriately refused to conduct a cross-reference search at the administrative level, or that the government's search was otherwise conducted in bad faith.

For all these reasons, Moffat has failed to raise a triable issue as to the government's treatment of his FOIA request.

**B.  The District Court's Fee Award**

Under FOIA, a court may "assess against the United States reasonable attorney fees" in any case "in which the complainant has substantially prevailed."  5 U.S.C. § 552(a)(4)(E)(i).  Although the district court concluded that Moffat had substantially prevailed in this litigation, the court declined to assess fees at the $225 hourly rate his counsel sought and instead approved a rate of $100 per hour.  Moffat has no dispute with the district court's reduction of the hours compensable, but contends on appeal that the district court employed an inappropriate measure of his attorney's hourly rate.

We review the district court's rate calculation for abuse of discretion.  See Hutchinson ex rel. Julien v. Patrick, 636 F.3d 1, 13 (1st Cir. 2011).  The reasonableness of a fee award is a quintessential exercise of the district court's judgment.  Accordingly, "'an appellate court is far more likely to defer to the trial court in reviewing fee computations than in many other situations.'"  Id. (quoting Lipsett v. Blanco, 975 F.2d 934, 937 (1st Cir. 1992)).

"Reasonable hourly rates will vary depending on the nature of the work, the locality in which it is performed, the qualifications of the lawyers, and other criteria."  United States v. One Star Class Sloop Sailboat, 546 F.3d 26, 38 (1st Cir. 2008).  The party seeking fees bears the burden of "establishing the

-21-

prevailing hourly rate . . . in the community for the performance of similar legal services by comparably credentialled [sic] counsel." Hutchinson, 636 F.3d at 16.  Moffat's counsel submitted an affidavit stating in cursory fashion that his typical hourly rate was $225, without offering any indication that his years in practice, his credentials, or his experience supported such a figure.  The affidavit also tells us nothing about counsel's experience with FOIA litigation.  These threadbare assertions are wholly insufficient to warrant his claimed hourly rate.[11]

Moffat further asserts that the district court erred in linking its hourly rate calculation to the $100 per hour rate used to compensate CPCS attorneys for their criminal defense work.  But in light of Moffat's failure to proffer any evidence in support of his hourly rate, we cannot say the court abused its discretion in basing the fee award on the value that CPCS had placed on attorneys representing indigent defendants.  Cf. Andrade v. Jamestown Hous. Auth., 82 F.3d 1179, 1190 (1st Cir. 1996) ("[T]he court is entitled to rely upon its own knowledge of attorney's fees in its surrounding area in arriving at a reasonable hourly rate.").

---

[11] On appeal, Moffat cites cases that discuss the prevailing market rate for civil rights attorneys in the Boston area.  See, e.g., Hutchinson, 636 F.3d at 16 (noting that $250/hour fee was "identical to those that the same lawyers had previously received in civil rights cases").  These general estimates do not show that those rates were justified for this attorney's work in this particular case.

In conclusion, there was no abuse of discretion in the district court's calculation of the fee award in this case.

**III.**

For the reasons stated, we **<u>affirm</u>** both the district court's entry of summary judgment and the fee award.